**Don D. BECK, Appellant,**

v.

**J. T. TEAGUE, Appellee.**

**Patent Appeal No. 75–615.**

United States Court of Customs and Patent Appeals.

May 6, 1976.

Harvey B. Jacobson, Jr., Washington, D. C., D. Douglas Price, Arlington, Va., attorneys of record, for appellant.

Donald Gunn, Houston, Tex., attorney of record, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

RICH, Judge.

This appeal is from the decision of the Patent and Trademark Office Board of Patent Interferences (board) awarding priority to the junior party Teague[1] against the senior party Beck[2] as to one of two counts in interference, on the ground that a preponderance of the evidence established that the Teague invention was reduced to practice prior to the filing date of the Beck application, the date of invention accorded Beck. We affirm.

### The Contested Subject Matter

The general subject of the interference is an apparatus for transporting disconnected joints of drill string pipe between the elevated floor of an oil drilling rig and a pipe rack located on the ground away from the rig. The apparatus accomplishes its purpose by moving the pipe in carriages suspended from a cable which extends from a location above the rig floor and passes over the pipe rack. The single count on appeal reads as follows:

Apparatus for handling pipe wherein the pipe is transported between a pipe rack and another location comprising:

a cable; means forming spaced apart pipe receiving carriages; means mounting said spaced apart pipe receiving carriages for longitudinal movement on said cable; means for moving at least one said carriage on said cable; and means anchoring one end of said cable;

means controlling the tension in said cable; said cable adapted to be positioned with part of it disposed in overlying relationship with respect to the pipe rack and part of it being disposed in close proximity to the recited another location;

said means for moving said carriages including a second cable, said second cable being attached to at least one of said carriages; and, means for moving said second cable so as to enable positioning of a carriage to which said cable is attached;

means forming at least one of said pipe receiving carriages into a trough for bottom supporting a pipe, said trough being upwardly opening with downwardly converging side walls, and further including a vertically disposed bulkhead for abuttingly receiving the end of a pipe joint thereagainst.

The history of the machine relied on by Teague, as set out in the testimony of his witnesses, is helpful to an understanding of the issues. Teague testified that he had "thought of" his machine while associated with a company called Modern Pipe Service and that construction of his machine was undertaken in August 1969, after he, Ed Earles, and Dennis Pike had formed Road Runner Rentals Corporation. The purpose of the corporation was to "lay down and pick up pipe and run casing"; its principal

---

1. Application serial No. 57,640, filed July 23, 1970, entitled "Pipe-Handling Apparatus."

2. Application serial No. 17,768, filed March 9, 1970, entitled "Pipe Handling Apparatus."

place of business was Longview, Texas. The Teague machine became part of the equipment of the corporation and was first used "somewhere around October the 1st," 1969. Subsequent modifications were made, but until the completion of another Teague machine in March-April 1970, the only other "laydown and pickup machine" owned by Road Runner was of a preexisting type known as a "Maydew," a machine which did not perform its function exclusively by cables. Only the first Teague machine is relied on for a reduction to practice. In November 1969, W. H. Phillips purchased Ed Earles's one-third interest in the corporation. Sometime prior to April 1970, Teague, Phillips, and Pike pledged their stock in Road Runner to the First National Bank of Henderson, Texas, and assumed the obligations of the corporation to that bank. The precise interest and control of the bank over the Teague machine and the other assets and records of the corporation are not clear. However, the record indicates that the permission of the bank had to be obtained by Phillips before he could move the Teague machine to Mississippi in order to use it to pay the debts of the corporation to the bank. After moving to Mississippi, Phillips did business under the name of Road Runner for about six months; thereafter, he and his attorney, LaSalle, formed Phillips Rental Service, the respective interests being 65% and 35%. About six months prior to the taking of testimony in this interference, LaSalle sold his interest to Billy Ray Ellis. The employment of the Teague machine by Phillips Rental is pursuant to an agreement with the bank in Texas and the machine is still being so employed.

## The Board's Decision

The board noted that Beck had taken testimony in support of a 1965 conception but had made no assertion or showing of diligence to his filing date, on which he relied for a reduction to practice. The board stated that in view of Beck's lack of a showing of diligence, "proof by Teague of an actual reduction to practice prior to Beck's constructive reduction to practice will dispose of the priority issues of this interference." Beck has not challenged this premise on which the board based its decision. Teague took testimony with respect to several uses of the Teague machine and relied on the following uses as reductions to practice:

1. Use of the machine to "lay down pipe from the rig floor to pipe racks adjacent to the rig" at "rig No. 2 of the Maxwell-Herring Co. * * * drilling the McClatchey Well No. 1 in Hunt County, Texas." The use took place "on about October 1–8, 1969," (hereafter referred to as the "Maxwell-Herring job").

2. "The machine was used for George C. Mitchell & Associates where it laid down 11,200 feet of pipe. The use occurred several days before December 2, 1969," (hereafter referred to as the "Mitchell job").

3. "The machine was next used for Imperial American & Management Co. where it laid down 8,800 feet of pipe. The use occurred several days before December 10, 1969," (hereafter referred to as the "Imperial American job").

4. "The machine was also used for the Arkansas-Louisiana Gas Co. where it laid down 8,357 feet of pipe. This use occurred a few days before January 18, 1970," (hereafter referred to as the "Arkansas-Louisiana job").

5. "The machine was next used for Pan American Petroleum Co. where it laid down 8,482 feet of pipe. This use occurred a few days before February 13, 1970," (hereafter referred to as the "Pan American job").

The board found that although the testimony of the witnesses was "sufficient to show the existence, in October of 1969, of a machine having structure clearly supporting the structure recited in Count 1," the first successful use of the machine did not occur until Christmas day of that year on a job for Pyburn Drilling Company at a location in Texas. This job was not relied on by Teague below, but is now relied on in this court. The board specifically found that the Maxwell-Herring job in October 1969 was not a successful use, but did not men-

tion the Mitchell job of early December 1969. The board did find that the remaining uses relied on by Teague below were "further evidence of successful reductions to practice of the Teague machine."

In finding for Teague as to priority, the board found it necessary to dispose of several collateral issues, finding against Beck on all of them. The board found that even though the Teague service under 37 CFR 1.287(a) did not have copies of Teague exhibits 5–28, 30, and 32 (business documents of Road Runner) attached to it, and even though the Teague service did not proffer access to the Teague machine, nevertheless, the sanctions of 37 CFR 1.287(d)[3] should not be applied because the inventor Teague, having assigned his application to Leroy LaSalle, was merely a "nominal" party and not the "real party in interest," saying,

> * * * we take the view that this board should look *only* to the real party in interest and the documents and things in his possession custody or control in making a determination as to whether the requirements of Rule 287(a) have been complied with, and not to an inventor who is merely a nominal party to the interference.

The board then found that Leroy LaSalle did not have possession, custody, or control of the Teague machine or the documents in question. The board also found that the fact that Teague had failed to produce the Teague machine or certain drawings (the "Mahon drawings") made of the machine in 1970 did not entitle Beck to any presumption that the machine and drawings, if produced, would be unfavorable to Teague.

The board stated that Teague had a right to prove his case solely by oral testimony, that the machine and drawings were not the best evidence, and that they were equally available to both parties because Teague would have had to subpoena them.

Finally the board refused to entertain any argument as to the veracity of Teague's testimony, stating that: "At the final hearing counsel for Beck stated that the veracity of Teague was not questioned."

### Appellant's Arguments

Beck states that the board erred in not imposing the sanction of 37 CFR 1.287(d) with respect to Teague exhibits 5–28, 30, and 32 and to so much of the testimony of Teague's witnesses as dealt with the Teague machine, "Since the machine and the documents were in the possession, custody or control of Teague during the period for discovery * * *." Beck argues that the board should not have excluded the inventor Teague from the ambit of 37 CFR 1.287(d) because, where an application is assigned, the term "party" in 37 CFR 1.287(a) includes not only the assignee but also the inventor. Further, Beck argues that even if the term "party" does not include the inventor, the real party in interest and therefore the person who the Patent and Trademark Office deems to be the "party" under that rule is not LaSalle alone but a tripartite group consisting of Teague, LaSalle and Phillips. To support this argument, Beck directs this court to certain testimony of Teague and Phillips which Beck contends establishes a "prima facie"

3. The pertinent provisions of 37 CFR 1.287(a) and (d) are as follows:

   § 1.287 *Discovery.*

   (a)(1) Each party who expects to take testimony must serve on each opposing party who requests service the following:

   (i) A copy of each document in his possession, custody, or control and upon which he intends to rely,

   (ii) A list of and a proffer of reasonable access to things in his possession, custody, or control and upon which he intends to rely, and

   (iii) A list giving the names and addresses of all persons whom he intends to call as witnesses and indicating the relationship of each person to the invention in issue.

   * * * * * *

   (d)(1) A party will not be permitted to rely on any document or thing in his possession, custody, or control, or on any witness, not listed and served by that party as required by paragraph (a) of this section, except upon a promptly filed motion accompanied by the proposed additional documents or lists together with a showing of sufficient cause as to why they were not served by the date set pursuant to paragraph (a) of this section.

case. He asserts that Teague and Phillips, as officers of Road Runner, and LaSalle, through his "control" of Teague, had sufficient control of the documents and machine to comply with 37 CFR 1.287(a).

Beck also states that, since the machine and Mahon drawings were not introduced by Teague, although available to him, the board erred in not presuming that if introduced they "would have contradicted Teague's parol evidence and would have established that the Teague Machine as it existed prior to March 9, 1970 did not satisfy the count on appeal." For this proposition, Beck relies on the following excerpt from a legal encyclopedia:

> Where it is apparent that a party has the power to produce evidence of a more explicit, direct, and satisfactory character than that which he does introduce and relies on, it may be presumed that if the more satisfactory evidence had been given it would have been detrimental to him and would have laid open deficiencies in, and objections to, his case which the more obscure and uncertain evidence did not disclose. [31A C.J.S. *Evidence* § 156(1) at 397 (1964).]

Beck also maintains that certain testimony by Teague relating to weather conditions at the Odessa, Texas, airport in January 1972 was impeached, and that this alleged impeachment "graphically demonstrates the unreliability of his sworn testimony."

Turning to the Teague machine, Beck argues that Teague failed to establish that he "conceived and built a complete and operative machine" prior to Beck's date of invention, because he "had not conceived" or did not have "a definite and concrete idea" of controlling more than one of the machine's pipe carriages, but was "merely experimenting" to obtain such control. Beck argues that the necessity of such control "is clear from the Beck and Teague applications, as well as the failures experienced with the Teague Machine."

With respect to the successful uses of the Teague machine found by the board, Beck argues, generally, that even if the Teague machine did lay down drill pipe, it was still not reduced to practice because the board found that it was never used to pick up pipe. Beck states that because of the "heavy weight" of drill pipe, it is "considerably more difficult and complicated" to pick up pipe than to lay it down and that, therefore, the "true test for a successful pipe handling machine of the present invention is its ability to pick up pipe."

As to the specific successful uses found by the board, Beck first directs his argument to the Christmas day use, pointing out, inter alia, that Teague "did not rely upon this alleged use below * * *." With respect to the Imperial American and Arkansas-Louisiana jobs, Beck argues that the testimony of the corroborating witness Phillips "was so seriously impeached in the record that it cannot be used to corroborate successful uses of the Teague Machine at these locations." The alleged impeachment is with respect to testimony by Phillips about the Mitchell job, which the board did not rely on as a successful use, and a job for Pyburn Drilling Company which Teague never relied on. Beck also argues that certain of Phillips' testimony with respect to the use of the Teague machine on the Arkansas-Louisiana job "is insufficient as a matter of law to corroborate a successful use of the Teague Machine," stating that Phillips "only" testified:

> It was definitely used. It did a real good job. It was a Jet Drilling Company rig. And the Company man's name was Sandy Sandifer. They were real happy with it.

Beck characterizes the quoted testimony as hearsay and states that it "establishes nothing in terms of how the machine was rigged or used."

With respect to the Pan American job, Beck does not attack Phillips' testimony, but relies on it, and on the testimony of Burns, to show that the use there was not successful. The parts of their testimony relied on relate to the failure of a compressed air motor associated with one of the pipe carriages, resulting in the Teague machine being "run off" before it had completed the job.

## OPINION

◼ The board did not err in permitting appellee to rely on his exhibits 5–28, 30, and 32 and on the testimony of his witnesses relating to the Teague machine. Beck, as proponent of the sanctions specified in 37 CFR 1.287(d) for failure to comply with 37 CFR 1.287(a), has the burden of showing that the *party* to whom the rule is directed had possession, custody, or control of the machine and of the corporate documents which comprise the exhibits at the time service under 37 CFR 1.287(a) was required. Whether the party is Teague, LaSalle, or both is a point we need not decide. Whatever the case, it is clear that Beck has not met his burden since he has failed to point to a single item in the record which purports to show possession, custody, or control of the machine or the documents by either Teague or LaSalle. That Teague may have been an officer of Road Runner at the time service was made pursuant to 37 CFR 1.287(a) is not significant; even if the machine and records were still owned and controlled by Road Runner, Road Runner has no interest in the Teague application and officers of corporations may not ordinarily treat corporate property as their own, as Teague would have had to do.

Beck's argument that LaSalle shared ownership of the Teague application with Teague and Phillips is based on a strained interpretation of what is in fact contrary testimony by Teague and, at best, ambiguous testimony by Phillips. Beck has introduced no written instrument to support his contention. His argument is clearly insufficient to overcome the prima facie case of sole ownership by LaSalle established by the written assignment, which is of record.

As to Beck's reliance on a presumption alleged to arise from Teague's failure to produce the Teague machine and the Mahon drawings, the fact that the board chose not to draw an adverse inference therefrom under the circumstances of this case and to hold that the machine and drawings were not the best evidence was not error.

As to the alleged impeachment of certain Teague testimony, Beck admits that it is "not directed to the precise questions of conception and reduction to practice  *  *." Indeed, dealing as it does with weather conditions at the Odessa, Texas, airport in January 1972, it is so remote from the pertinent issues in this interference as to have little, if any, bearing on the testimony relating to those issues.

◼ Beck presumes too much when he argues that Teague has failed to show that he established control over more than one of the pipe carriages on his machine. The count does not call for such control. As we make plain below, whatever failures there might have been with the Teague machine, and whatever the embodiments described in the Beck and Teague applications, there was at least one successful use prior to Beck's date of invention of a machine that did meet the limitations of the count. That is all Teague needs to establish to entitle him to an award of priority.

We feel the board was also correct in considering the successful use of the Teague machine to lay down pipe to be sufficient to establish a reduction to practice. The machine is not difficult to comprehend, and our examination of the record persuades us that there is no essential difference between picking up pipe and laying it down with the machine. Beck's statement that it is "considerably more difficult and complicated" to pick up pipe is unsupported by any reference to the record. Merely stating that drill pipe is "heavy" is not enough.

With regard to the specific uses found by the board to be successful, we need not discuss the merits of Beck's arguments with respect to the Christmas day use, since we find the board did not err in finding that the other uses, which were relied on by Teague below, were successful. With respect to these other uses, we find the board properly relied on Phillips' testimony as to the Imperial American and Arkansas-Louisiana jobs. Even if Phillips' testimony was impeached with respect to the Mitchell and Pyburn Drilling jobs (and we do not believe that it was), neither of these uses was relied on by the board as a successful use and both

are independent of the uses which the board did point to as successful.

Beck's characterization of the quoted testimony of Phillips with respect to the Arkansas-Louisiana job is without foundation. It is clear from the remainder of Phillips' testimony that when he said the Teague machine was "used," he was testifying that it was employed to perform its function of picking up or laying down drill pipe. Since Phillips was present at the job, his testimony that the machine was "used" is not hearsay. Nor is this Phillips' only testimony with respect to this job. The record shows that he identified an invoice to Arkansas-Louisiana as being for that job and Beck does not dispute the board's finding that that invoice was paid, a strong indication of successful use. As to Beck's objection that the quoted testimony does not establish how the machine was rigged or used, the simple answer is that it was not intended to; the testimony as to how the Teague machine met the limitations of the count is elsewhere in the record. Beck does not argue that the Teague machine as employed on the Imperial American and Pan American jobs did not meet the limitations of the count. Further, Beck does not dispute the finding by the board that a machine meeting the limitations of the count was constructed by Teague as early as October 1969. This finding is supported by the record, which further indicates that, although some modifications were made to this machine thereafter, the modifications were immaterial to the limitations of the count.

With respect to the testimony relied on by Beck to show that the Pan American job was not a successful use, Beck cites no part of the record which identifies that testimony with the Pan American job. Indeed, an examination of the testimony shows positively that it is not related to the Pan American job. The Burns testimony is expressly directed to what he stated was "the El Dorado job." Teague identified the El Dorado (Arkansas) job with a job for Austral Oil Company near (west of) Springhill, Louisiana, and he testified to the same fail-

ure of the motor (actually, the air compressor) as Burns did. Teague testified to the Pan American job as a different job, identifying it as also being near (east of) Springhill, Louisiana. It is evident that the Springhill, Louisiana, job, concerning which Phillips testified to a failure of a compressed air motor, was the Austral Oil Company job, not the Pan American job.

The various vague and conclusory statements with which Beck closes his argument do not detract from the correctness of the board's conclusion.

The decision of the board is *affirmed*.

*AFFIRMED.*